UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| LARRY T. KELLEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | No. 1:03-cv-91 |
| | ) | *Edgar* |
| CHARLIE JONES, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM

Larry T. Kelley ("Kelley") has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 [Court File No. 1]. Kelley seeks review of his 1991 state conviction for first degree murder. Kelley was convicted of first degree murder by a jury on December 5, 1991, and received a life sentence.

The respondent has filed a motion to dismiss [Court File No. 5]. After reviewing the record and the applicable law, the Court concludes the § 2254 petition is without merit and it will be **DISMISSED** [Court File No. 1]. Respondent's motion to dismiss will be **GRANTED** [Court File No. 5].

**I.     STANDARD OF REVIEW**

Kelley may obtain habeas relief if he can demonstrate he is in custody pursuant to the judgment of a state court in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254. Under Rule 8 of the RULES GOVERNING SECTION 2254 PROCEEDINGS IN THE UNITED STATES DISTRICTS COURTS, the Court is to determine, after a review of the response, the transcript, record of state court proceedings, and the expanded record, whether an evidentiary hearing is required. If a hearing is not required, the district judge is to dispose of the case as justice dictates.

1

The Court finds it is unnecessary to hold an evidentiary hearing in the present case.

The decision of the state courts that petitioner failed to carry his burden of showing, by a preponderance of the evidence, that the jury had an insufficient evidentiary basis to find that defendant acted with premeditation and deliberation, and that the trial court's evidentiary ruling was erroneous, is reviewed by this Court under 28 U.S.C. § 2254(d), which is a part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This statute limits a federal district court's jurisdiction to review habeas claims on the merits. In particular, a court considering a habeas claim must defer to any decision by a state court concerning that claim unless the state court's judgment (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1) and (2).

## II.     FACTUAL BACKGROUND

Kelley was indicted and convicted of first degree murder. The Court of Criminal Appeals of Tennessee summarized the evidence against the petitioner:

> The victim, Brenda Kelley, was divorced from the defendant on May 17, 1990. The marriage had lasted 2 ½ years. Afterwards, the defendant and the victim twice attempted a reconciliation but failed. In November of 1990, the victim established a separate residence.
>
> By this time, the victim had sought and received from the courts an order of protection from the defendant. On December 2, however, the victim reported to the police that on the day before, the defendant had confronted her at a laundromat, choked her, and threatened to kill her. In fact, the defendant admitted to the victim's daughter, who along with the victim's son had continued to reside in the defendant's home, that he had committed the assault and apologized for the incident.
>
> At about 9:00 P.M. that evening, the defendant shot and killed the victim while parked just outside the Church of the Harvest in Cleveland. Witnesses heard screams

2

and saw the defendant struggle with the victim as she tried to get out of the passenger door of his[1] automobile. The defendant fired four or five shots then climbed out of the car and pushed the victim to the ground. A gun was found in the seat of the vehicle. When approached by the pastor and members of the church who had witnessed the incident, the defendant appeared distraught and exclaimed, "Oh, my God," and "What have I done?

Police identified the weapon as a Colt .380 semi-automatic handgun. The clip held five bullets. Empty shells, found inside the vehicle, indicated the bullets were hollow point, designed to cause maximum damage. Another weapon was found hidden in a tissue box in the victim's vehicle. In their search of the defendant's car, officers found an ammunition belt for the bullets.

Medical testimony established that the victim bled to death from five gunshot wounds to the back. Her face was swollen and discolored from an apparent beating. There was evidence of a bloody nose.

The defendant was evaluated at the Middle Tennessee Mental Health Institute in May of 1991. A medical team determined that the defendant had a mental illness, "an adjustment disorder with depressed mood." The report indicated that the defendant did not exhibit disillusional thinking or grossly false belief. There was some indication that the defendant experienced visual hallucinations, had delusionary religious guilt, and heard voices. The defendant was classified as having a dependent and avoided personality, a type of mental illness.

James Flowers, the defendant's business partner in the heat and air-conditioning business, testified for the defense. He described the defendant's behavior just before the shooting as disoriented and preoccupied. Friends, family and associates of the defendant testified that "something was wrong" with the defendant during the Thanksgiving holidays; he appeared depressed and nervous. One witness said the defendant looked "like a zombie."

Bruce Lee, Jr., a physician who treated the defendant two days before the shooting, testified that the defendant had acute anxiety and acute reactive depression. He prescribed sleeping pills and antidepressants then called the defendant's mother and suggested that she take away his guns and ammunition.

Dr. Jackson White testified on rebuttal for the state. He determined that the defendant had a stress-related depression at the time of the shooting but knew the

---

[1] The trial transcript reflects that the murder occurred in the victim's, rather than the defendant's, vehicle [Addendum No. 6, Vol. I, at 75, lines 18-21].

difference between right and wrong and had control over his behavior. Dr. Samuel Craddock concluded that the defendant was competent to stand trial, was committable to a psychiatric facility because of a mental illness, but was able to appreciate the wrongfulness of his act at the time of this offense. Dr. Craddock conceded that the defendant's depression affected his ability to inhibit his impulses but held to his opinion that the defendant did not qualify for an insanity defense.

Dr. Kenneth Anchor, an associate professor of psychology at Vanderbilt, examined the defendant in March of 1991. He concluded that the defendant suffered from "a severe major depressive episode with psychotic features." He testified that the defendant was insane at the time of the shooting. That is, the defendant, in his opinion, did not have the ability to distinguish right from wrong and, because of his illness, could not conform his acts even if he had known the difference. Dr. Anchor explained that just because the defendant asked forgiveness immediately after the shooting did not indicate that he understood the wrongfulness of his act.

*State v. Kelley*, 868 S.W.2d 733, 734-35 (Tenn.Ct.Crim.App. 1993).                    .

### III.   PROCEDURAL BACKGROUND

Kelley was convicted of first degree murder and received a life sentence, on December 5, 1991, in the Circuit Court of Bradley County, Tennessee. Kelley appealed his conviction on the grounds that the evidence was insufficient to establish that he acted with premeditation and deliberation because his mental illness precluded him from formulating the requisite mental intent and that the trial court erroneously refused to admit, into evidence, a document upon which defense witness, Dr. Anchor, relied upon when he concluded that the defendant was insane at the time of the offense.

The Tennessee Court of Criminal Appeals affirmed the conviction on August 11, 1993. Kelley did not file an application for permission to appeal in the Tennessee Supreme Court. The petitioner then filed his first state petition for post-conviction relief on May 3, 1995, alleging ineffective assistance of counsel, including an allegation that counsel failed to timely file an application for permission to appeal to the Tennessee Supreme Court, and other constitutional

4

violations. After an evidentiary hearing, the state trial court entered a judgment finding that counsel was ineffective for failing to notify the petitioner of his ability to file a *pro se* application to the Supreme Court. The trial court further held that the other grounds raised in the petition were without merit and denied relief. On appeal petitioner only argued he was entitled to seek a delayed appeal and the Tennessee Court of Criminal Appeals agreed [Addendum No. 3]. Petitioner then filed an application for permission to appeal in the Supreme Court which was denied on March 22, 1999 [Addendum No. 3].

The petitioner filed a second state post-conviction petition raising essentially the same grounds as were raised in his first petition [Addendum No. 2]. The trial court dismissed the case as being previously determined and the appellate court affirmed the dismissal. On September 23, 2002, the Tennessee Supreme Court denied petitioner's application for permission to appeal [Addendum No. 3]. Petitioner filed this habeas petition in October 2003, seeking relief claiming that the evidence was insufficient to convict him and the trial court improperly excluded a piece of evidence.

## IV.  ANALYSIS

### A.  Insufficient evidence

Kelley claims the evidence was insufficient to support a conviction for first degree murder or lesser offenses because he proved he was insane at the time he committed the crime and his insanity fully negated the element of mental intent. Kelley argues that "[t]he testimony introduced at trial, while consistent with sanity is also consistent with insanity and therefore [sic] insufficient as a matter of law to find the petitioner guilty of first degree murder" [Court File No. 1].

The standards are clearly set out in *Jackson v. Virginia*, 443 U.S. 307, 324 (1979), that a state

5

shall not obtain a conviction without proving each and every element of an offense beyond a reasonable doubt. Kelley must show that the state court decision on this issue was the result of an unreasonable determination of the facts in light of the evidence presented in state court. See 28 U.S.C. § 2254(d)(2).

Sufficient evidence supports a conviction if, after viewing the evidence and the inferences to be drawn therefrom in light most favorable to the prosecution, the Court can conclude that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 324; *Walker v. Russell*, 57 F.3d 472, 475 (6th Cir.), *cert. denied*, 516 U.S. 975 (1995). This standard of review does not permit the federal habeas court to make its own subjective determination of guilt or innocence; the standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). This due process guarantee of sufficiency of the evidence extends only to facts needed to establish the elements of the crime.

Pursuant to 28 U.S.C. § 2254(e)(1), a determination of a factual issue made by a state court shall be presumed correct, and the burden is on Kelley to rebut the presumption of correctness of clear and convincing evidence. Where the state court findings have support in the record, those findings must control, even though the federal habeas court may be inclined to render other findings which also have support in the record. See 28 U.S.C. § 2254(d)(2); *Wainwright v. Goode*, 464 U.S. 78, 85 (1983).

In a federal habeas corpus proceeding in which a state prisoner challenges the sufficiency of the evidence supporting his conviction, the prisoner "is entitled to a determination whether the record evidence could support a finding of guilt beyond a reasonable doubt." *Moore v. Duckworth*,

6

443 U.S. 713, 714 (1979). However, the petitioner is entitled to habeas relief only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 324 (1979). *See Brofford v. Marshall*, 751 F.2d 845, 856 (6th Cir.), *cert. denied*, 474 U.S. 872 (1985).

Witness credibility is an issue to be left solely within the province of the jury, *United States v. Schultz,* 855 F.2d 1217, 1221 (6th Cir. 1988), and substantial deference should be given to the trier of fact. *United States v. Ayotte*, 741 F.2d 865, 867 (6th Cir.), *cert. denied*, 469 U.S. 1076 (1984). In addition, credibility findings made by state courts are entitled to the presumption of correctness. *McQueen v. Scroggy,* 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997), *Smith v. Jago,* 888 F.2d 399, 407 (6th Cir. 1989), *cert. denied,* 495 U.S. 961 (1990). The Sixth Circuit has previously found that the appellant "bears a heavy burden" when insufficiency of the evidence is claimed. *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir.), *cert. denied*, 476 U.S. 1123 (1986). "It is for the jury, not this court, to assess the credibility of the witnesses presented at trial." *Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992). This Court should not attempt to substitute its opinion for that of the jury which convicted petitioner. *York v. Tate*, 858 F.2d 322, 329 (6th Cir. 1988). The trial court found that the evidence in this case was sufficient to support a finding of guilt beyond a reasonable doubt. The appellate court concluded that despite the mental illness of the defendant, the proof was sufficient to establish he acted with premeditation and deliberation in firing the fatal shots. *State v. Kelley*, 868 S.W.2d at 736.

Petitioner alleges the state court decision is contrary to, or involves an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States, and the decision was based on an unreasonable determination of the facts in light of the

7

Case 1:03-cv-00091   Document 18   Filed 09/22/05   Page 7 of 13   PageID #: 15

evidence presented in the state court proceedings. Kelley contends that he was convicted without the state proving each and every element of the offense. Specifically, Kelley contends he presented numerous witnesses, including his expert, Dr. Anchor, who clearly stated the petitioner was suffering from a mental illness and was insane. Nevertheless, Kelley does concede that there was testimony, introduced at trial, which was also consistent with sanity [Court File No. 2, at 9]. The determination of whether to believe the sanity or insanity testimony was strictly in the jury's province.

The proof before the jury included testimony from several physicians. However, the conflicting diagnosis regarding the sanity of petitioner is found in the opinions of Dr. Kenneth Anchor and Dr. White. Dr. Anchor, Associate Professor of Psychology at Vanderbilt University testified on petitioner's behalf at trial [Addendum No. 6, Vol. II at 225-263].[2] Dr. Anchor testified he spent approximately half a day with petitioner on March 23, 1991, administering a psychological evaluation and interviewing him. Additionally, Dr. Anchor interviewed two of petitioner's family members. Dr. Anchor concluded that on March 23, 1991, petitioner was suffering from a major, depressive episode [*Id*. at 247].

Petitioner participated in counseling with Dr. Anchor's colleague, a female therapist, for a few months. Dr. Anchor testified that in December of 1990, petitioner was suffering from a severe major depressive episode with psychotic features. Dr. Anchor based his diagnosis on his own testing and observation of petitioner and on petitioner's treatment at Dr. Anchor's office. In addition, Dr. Anchor considered petitioner's history including the treatment Mr. Kelley received just prior to and after the date of the murder. Dr. Anchor stated he believed that petitioner lacked the cognitive

---

[2] Dr. Anchor received his PhD in clinical psychology.

ability to determine what was right and wrong at the time of the murder and due to the stressors and petitioner's mental illness, he was unable to conform his acts to do what was right [Addendum No. 6, Vol. II, at 253-54].

On cross-examination, Dr. Anchor also revealed that many people with the same condition which he diagnosed petitioner as having are able to understand the nature and quality of their acts and are able to tell the difference between right and wrong. When questioned by the trial judge, Dr. Anchor was unable to identify the date on which petitioner became insane or the date on which he became sane [Addendum No. 6, Vol. III, at 332-33].

The state presented four rebuttal witnesses from Middle Tennessee Mental Health Institute in Nashville where petitioner resided for thirty (30) days under constant observation as the professionals conducted a mental evaluation. Dr. Jack White,[3] clinical director of Middle Tennessee Mental Health Institute testified petitioner did not suffer a major depression and the one or two incidents of self-reported hallucination were not indicative of a pattern or a disorder [*Id.* at 378]. Dr. White testified petitioner was not suffering from a psychosis; he was not out of touch with reality; he knew the difference between right and wrong; and he could control his behavior [*Id.* at 378]. Dr. White testified he concurred in Dr. Lee's diagnoses of petitioner as suffering from a reactive depression and their team never observed petitioner exhibiting signs of psychosis or loss of contact with reality [*Id.* at 379-384].

Petitioner's only solid evidence of insanity was the testimony of Dr. Anchor, a psychologist, hired to evaluate and treat petitioner. Although the trial court instructed the jury on the defense of

---

[3] Dr. White earned a medical degree and completed a residency in psychiatry.

insanity and to consider the nature of the defendant's illness,[4] the jury obviously rejected Dr. Anchor's testimony that petitioner was insane. It is the jury's prerogative to decide what evidence to reject and what evidence to accept as reliable. The states medical proof demonstrated that petitioner suffered from a reactive depression without psychosis or loss of contact with reality. There was proof to support the conclusion that petitioner was not insane at the time he committed the murder. Looking at the events that occurred prior to the murder, the jury had sufficient evidence to find the essential elements of first degree murder beyond a reasonable doubt. The petitioner had choked and threatened to kill his ex-wife the day before killing her; the day of the murder he went to a movie with the victim's daughter and asked the daughter to forgive him for choking and threatening to kill her mother; he was waiting in the church parking lot when his ex-wife exited the church; he was carrying a loaded weapon when he forced the victim into her vehicle; she struggled to exit the vehicle; he had to pull the trigger five times to shoot her five times in the back; and he asked for forgiveness immediately after killing his ex-wife. That evidence does not provide proof that petitioner was out of touch with reality, rather it indicates that petitioner planned the crime and understood that his actions were wrong. Therefore, the evidence supports the jury's conclusion that petitioner was not insane when he committed the crime.

---

[4] Although the actual instructions given do not appear in the record and did not appear in the record on appeal, the appellate court quoted the following instructions given to the jury:

> I'm just telling [the jury] that they can take into consideration the evidence . . . that they've heard in determining whether the defendant's act was intentional. . . . [I]f the jury were to determine that his mental condition was such that his acts were not intentional . . . then that eliminates first [and] second degree murder and voluntary manslaughter.

*State v. Kelley*, 868 S.W.2d 733, 735 (Ct. Crim. App. Tenn. 1993) [Court File No. 8].

Mental illness alone, is insufficient to establish insanity. Where, as here, there is conflicting expert testimony presented, the question of petitioner's sanity at the time of the commission of the offense is for the jury and the jury has the right to accept or reject the opinion of any expert. Absent a serious flaw in the testimony of the state's expert, the jury finding of sanity will not be disturbed.

There is substantial evidence from which the jury could infer that the petitioner was legally sane at the time of the offense. The jury clearly accepted the testimony of the State's expert that the defendant, despite his mental illness, knew and appreciated the consequences of his actions at the time of the crime and knew his actions were wrong. The petitioner has not identified, and the Court has not found, any serious flaw in the testimony of the State's expert, the jury's finding of sanity will not be disturbed.

Although there is substantial conflict between Dr. Anchor's testimony and the professionals at Middle Tennessee Mental Health Institute, the jury's determination that petitioner was sane at the time of his crime will not be disturbed since it is supported by substantial evidence. Consequently, the jury's finding must be sustained in the face of conflicting evidence from Dr. Anchor because the question of weighing that evidence and resolving that conflict is a question of fact for the jury's determination. The jury's determination that petitioner was sane when he committed the murders was neither an unreasonable interpretation of the facts nor contrary to federal law. Thus, since petitioner was not found to be insane at the time he committed the murder, the element of mental intent has not been negated. After viewing the evidence and the inferences to be drawn therefrom in light most favorable to the prosecution, the record reflects the evidence is sufficient, and a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Accordingly, petitioner is not entitled to any federal habeas corpus relief on his claim of insufficient evidence.

      **B.**      **Violation of State Rules of Evidence**

Kelley claims the state trial court erred when it allowed a medical report to be introduced only for identification purposes. Two days after he committed this murder, petitioner was treated by a physician who diagnosed a mental illness and recommended hospitalization. During his trial, the trial court refused to admit the document into evidence when petitioner attempted to introduce this report through his expert, Dr. Anchor, who was not the author of the report.

The Tennessee Court of Criminal Appeals determined that the Tennessee Rules of Evidence did not authorize the admission of this report. The Court observes that the contents of the document were testified to by petitioner's witness [Addendum No. 6. Vol. II, at 232-33].

The Supreme Court of the United States has established that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991), *citing Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) and *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Rulings on the admission or exclusion of evidence are matters of state law questions and are not cognizable in federal habeas proceedings unless they rise to a level of constitutional magnitude; they must be so egregious as to deny a defendant a fundamentally fair trial. *See Clemmons v. Sowders*, 34 F.3d 352, 357-358 (6th Cir. 1994); *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir.), *cert. denied*, 513 U.S. 1061 (1994). To determine whether there was a constitutional violation, the Court must evaluate whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Kelley must establish "actual prejudice" to obtain habeas relief. *Id*.

The trial court properly excluded the medical report on appropriate and adequate state law grounds. TENN. R. EVID. 703. However, the contents of the report were introduced by the testimony of Dr. Anchor. Therefore, even if the ruling was in error, petitioner has not demonstrated and the Court does not find that the ruling render the trial so fundamentally unfair as to constitute a denial of federal rights. Accordingly, petitioner is not entitled to an habeas relief on this claim.

V. **CONCLUSION**

The petitioner is not entitled to habeas corpus relief and his 28 U.S.C. § 2254 petition [Court File No. 1] will be **DISMISSED**. The respondent's motion to dismiss [Court File No. 5] will be **GRANTED**.

An appropriate judgment will enter.

*/s/ R. Allan Edgar*
R. ALLAN EDGAR
CHIEF UNITED STATES DISTRICT JUDGE